IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BECKY BAUGHMAN, et al., | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 08-2901 (JBS/KW) |
| v. | **OPINION** |
| UNITED STATES LIABILITY INSURANCE COMPANY, | |
| Defendant. | |

APPEARANCES:

Scott B. Gorman, Esq.
GORMAN & GORMAN, ESQS.
Liberty View
457 Haddonfield Road
Suite 400
Cherry Hill, NJ 08002-2220
    Counsel for Plaintiffs Becky Baughman, Steven Baughman, and
    Kiddie Kollege Daycare & Preschool, Inc.

Lila Wynne, Esq.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, PC
Woodland Falls Corporate Park
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
    Counsel for Defendant United States Liability Insurance
    Company

**SIMANDLE**, District Judge:

    The Court is asked to resolve a dispute regarding insurance coverage for several underlying state court actions arising out of alleged mercury contamination of a daycare center owned, until recently, by Plaintiffs Becky Baughman and Steven Baughman. Defendant United States Liability Insurance Company has declined to defend or indemnify Plaintiffs in the underlying actions despite their comprehensive general liability ("CGL") policy.

Presently before the Court are Plaintiffs' motion for partial summary judgment [Docket Item 10] and Defendant's cross-motion for summary judgment [Docket Item 13].  The central issues to be decided are whether the underlying state court actions seek "damages" for "bodily injury" within the meaning of the CGL and whether coverage for those actions falls within the absolute pollution exclusion of the CGL.  For the reasons set forth below, the Court will grant summary judgment in favor of Plaintiffs on their claims for declaratory judgment and breach of contract, but grant summary judgment in favor of Defendant on Plaintiffs' claims of breach of implied duty of good faith and fair dealing, common law fraud, and violations of the New Jersey Consumer Fraud Act.

## I.   BACKGROUND

Becky and Stephen Baughman are a husband and wife who moved from Texas to Gloucester County, New Jersey in 2000.  (Becky Baughman Certification ¶¶ 1, 3, 18.)  On December 9, 2005, the Baughmans purchased an existing daycare center, Kiddie Kollege Daycare & Preschool, Inc. ("Kiddie Kollege") from Matthew Lawlor and Julie Lawlor.  (Id. ¶ 4.)  The Baughmans were acquainted with Kiddie Kollege because their children attended the daycare center.  (Id. ¶ 5.)  The Baughmans similarly purchased a commercial package insurance policy which included comprehensive general liability coverage.  (Becky Baughman Certification ¶ 6, Exh. A.)  Becky Baughman is the sole named insured on the CGL

policy.  (Becky Baughman Certification, Ex. A.)  The inception date of that policy was December 9, 2005.  (Becky Baughman Certification ¶ 6.)

From December, 2005 through July 28, 2006, the Baughmans owned and operated Kiddie Kollege, where Stephen Baughman was an employee.  (Stephen Baughman Certification, Exh. A.)  On July 28, 2006, the New Jersey Department of Environmental Protection ("NJDEP") informed Becky Baughman that the daycare center building was uninhabitable due to mercury contamination.  (Becky Baughman Certification ¶ 10.)  On that same day the Baughmans closed the daycare center.  (Id. ¶ 9.)  It is undisputed that the alleged mercury contamination is due to the business operations of Accutherm, Inc., a thermometer manufacturing company that operated in the building approximately twenty years before the Baughmans purchased Kiddie Kollege.

Beginning in October, 2006, five lawsuits were commenced on behalf of children who attended Kiddie Kollege and persons who worked for the daycare center naming the Baughmans, among others, as defendants.  (Gorman Certification Exhs. A-E.)  Those actions, all brought in Gloucester County Superior Court, are: Mignano v. Jim Sullivan, Inc., Docket No. GLO-L-1309-06; Conti v. Jim Sullivan, Inc., Docket No. L-1617-06; Kahana v. Accutherm, Inc., Docket No. L-1823-06; Foster v. Jim Sullivan, Inc., Docket No. L-280-07; and Allonardo v. Jim Sullivan, Inc., Docket No. L-406-08. (Id.) The Conti and Foster actions have since been voluntarily dismissed.  (Gorman Certification ¶ 10.)  The Baughmans properly

3

notified Defendant of each of the underlying lawsuits and
Defendant disclaimed coverage for each of those actions.[1]
(Gorman Certification ¶¶ 28-31; Becky Baughman Certification ¶¶
12-15.)  Thus, the Baughmans have been forced to provide for
their own defense.  (Becky Baughman ¶ 16.)

### A.   Underlying Lawsuits

The underlying lawsuits at issue were brought against not
only the Baughmans, but Accutherm, Jim Sullivan, Inc. (the
property owner), the Lawlors, the NJDEP, Gloucester County, and
Franklin Township.  The facts alleged in all three underlying
lawsuits are similar and they tell a similar story.  According to
those complaints, the building at 162 Station Avenue,
Franklinville, New Jersey (the location of Kiddie Kollege) has
been contaminated with mercury since occupied by Accutherm, Inc.,
a thermometer manufacturer, from June, 1984 until at least June,
1990.  (Mignano Complaint ¶¶ 22, 33-34; Conti Complaint ¶ 6;
Kahana Complaint ¶¶ 39-50.)  Despite directives from the NJDEP,
Accutherm did not clean up the site.  (Mignano Complaint ¶¶ 54-
56; Conti Complaint ¶ 6; Kahana Complaint ¶¶ 25-29.)

Over the years, various governmental and private parties
performed testing and warned of mercury contamination in the

---

[1] Plaintiffs have voluntarily dismissed all claims related
to the Foster matter.  Further, it appears that as of May 5,
2009, Plaintiffs had not yet been served with the complaint in
Allonardo and so have not yet been required to defend in that
action, making their request for coverage in that action
premature.  (Wynne May 7, 2009 Certification.)  The Court will
consequently discuss only the three remaining underlying suits.

building.  As early as 1987, the New Jersey Department of Health
noted the "mercury exposure problem" at the Accutherm building.
(Kahana Complaint ¶ 55.)  In 1994, National Midlantic Bank, the
mortgage holder for the site, commissioned a report by
Environmental Waste Management Associates, which warned
Accutherm, "Any person entering the building should be equipped
in level C personal protection equipment" due to toxic levels of
mercury vapor.  (Mignano Complaint ¶¶ 41-46; Kahana Complaint ¶¶
80-82.)  In 1995, the Gloucester County Department of Health
instructed Accutherm:

> The best method of control would remain to clean up
> the facility of any remaining mercury and after a
> thorough decontamination, recheck vapor levels.  I
> would suggest that there be restriction of
> personnel entering the building to only those
> properly trained and equipped.

(Mignano Complaint ¶ 58; Kahana Complaint ¶ 94.)  The United
States Environmental Protection Agency reported in 1995:

> Based on air monitoring results, the potential for
> exposure to Hg vapor outside the building does not
> exist.  Soil sampling date indicates that though Hg
> is present in two samples . . . the site does not
> present an immediate threat to health or the
> environment.

(Kahana Complaint ¶ 98.)  In June, 1996, the NJDEP added the site
to its list of "Known Contaminated Sites in New Jersey," on which
it remained until at least 2004.  (Mignano Complaint ¶¶ 63-64,
74-75, 104.)

Despite these warnings, Franklin Township, Gloucester
County, and the State of New Jersey permitted Jim Sullivan to

purchase the unremediated property and convert it to a daycare center, despite alleged actual knowledge by all participants that the site was contaminated.  (Mignano Complaint ¶¶ 33-103; Kahana Complaint ¶¶ 51-124.)  As of June, 2006, Sullivan had not performed any indoor testing.  (Kahana Complaint ¶ 154.)  On July 28, 2009, NJDEP received "preliminary results of indoor mercury testing, revealing widespread mercury vapor exceeding acceptable environmental standards for human exposure, as well as elemental mercury on indoor surfaces also exceeding acceptable standards for human exposure."  (Kahana Complaint ¶ 156.)

    1.   Allegations and Claims Regarding the Baughmans

The specific allegations regarding Plaintiffs, however, are sparse in each of the complaints.  The Mignano Complaint alleges only:

> The remaining defendants, Kiddie Kollege Daycare & Preschool, Inc., Stephen and Becky Baughman, and Julie and Matthew Lawlor, failed to make reasonable inquiry as to the nature of the site, which, inter alia, was listed as a contaminated site by NJ DEP in several lists and publications from 1997 until at least 2004.

(Mignano Complaint ¶ 104.)  It brings claims of strict liability, public nuisance, negligence, and battery against the Baughmans. (Id. ¶¶ 136-66.)

The Conti Complaint has only this to say about the Baughmans: "Upon information and belief, Defendant[s] Stephen and Becky Baughman are the owners and operators of Kiddie Kollege Day Care and Preschool."  (Conti Complaint ¶ 8.)  It brings claims of

battery, strict liability, and negligence against all defendants. (Id. ¶¶ 17-35.)

The Kahana Complaint has two references to the Baughmans, one identifying them as "the current beneficial owners" of Kiddie Kollege at the time of its closure, (Kahana Complaint ¶ 36), and observing that on July 28, 2008, the NJDEP notified the Baughmans, along with Sullivan and Franklin Township, "that the building should not be inhabited until further notice," (id. ¶ 157). The Kahana class bring claims of strict liability, negligence, nuisance, battery, and public nuisance against the Baughmans. (Id. ¶¶ 191-215, 219-25.)

>       2.   Harm and Relief Requested

The harm and alleged in the underlying complaints varies only a little. The Mignano Complaint, a proposed class action, begins by noting the "dangers of mercury exposure" including permanent damage to various organs, (Mignano Complaint ¶ 3), "increased risk of invisible genetic injury and/or an enhanced susceptibility to cancer," (id. ¶ 119). The named infant plaintiff, however, "has no current symptoms of any bodily injury." (Id. ¶ 114.) The Mignano plaintiffs seek court-administered medical surveillance "with defendants being ordered to pay the costs associated with such a program," a constructive trust of monies defendants (including the Baughmans) received under the New Jersey Spill Compensation Fund, along with other forms of declaratory and injunctive relief and "judgment in favor of each class member for the injuries suffered as a result of the

conduct alleged herein." (Id. Prayer for Relief.)

The Conti Complaint alleges that Jacob Conti, age four, "was exposed to mercury" which "is known to be a dangerous substance and can cause severe harm to young children," so that the Conti plaintiffs "have and will continue to be injured, damaged and otherwise harmed" due to exposure to mercury. (Conti Complaint ¶¶ 12-14.) The Conti plaintiffs request "injunctive relief" in the form of court-supervised medical surveillance, declaratory relief, and compensatory damages. (Id. ¶¶ 15-35)

The Kahana Complaint, another class action, notes the "increased risk of severe health and developmental affects" due to exposure to mercury, with symptoms that "develop insidiously over a period of years." (Kahana Complaint, ¶¶ 6, 8-11.) The children of the named plaintiffs' "feet peeled and they both constantly seemed tired," while one child grew slowly, was thin, and had no appetite. (Id. ¶ 136.) The Kahana class seeks monetary damages, medical monitoring, and other equitable relief to address the public nuisance. (Id. ¶¶ 191-225.)

**B.   CGL Policy**

The CGL policy states its coverage, in relevant part, as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured again any "suit" seeking those damages . . .

(Becky Baughman Certification, Exh. A, CGL Policy at 1.) "Bodily

injury" is defined as (a) bodily injury, (b) sickness, (c) disease, or (d) mental anguish or emotional distress arising about of a, b, or c, "sustained by a person, including death resulting from any of these at any time." (Id., Expanded Definition of Bodily Injury.) "Damages" is not defined.

The absolute pollution exclusion reads as follows:

> f. Pollution, Organic Pathogen, Silica, Asbestos and Lead
> 1. "Bodily injury" or "property damage"; or
> . . .
> 3. Loss, cost or expense, including but not limited to payment for investigation or defense, fines and penalties, arising out of any governmental or any private party action, that an insured or any other party test for, monitor, clean up, remove, contain, mitigate, treat, detoxify or neutralize or in any way respond to or assess the actual or alleged effects of "pollutants", "organic pathogens", "silica", or lead;
> arising directly, indirectly, in concurrence with or in any sequence out of the actual, alleged or threatened presence of or exposure to, ingestion, inhalation, absorption, contact with discharge, dispersal, seepage, release or escape of "pollutants", "organic pathogens", "silica", asbestos, or lead, whether or not any of the foregoing are (1) sudden, accidental or gradual in nature; (2) intentional; or (3) expected or intended from the standpoint of the insured.
> . . .
> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, "volatile organic compound" and gases therefrom, radon, combustion byproducts and "waste."
> . . .

(Becky Baughman Certification, Exh. A, Endorsement L-599.)

### C.    Procedural History

In May 2008, Plaintiffs filed a complaint in the Superior Court of New Jersey seeking declaratory judgment declaring that Becky Baughman, Stephen Baughman, and Kiddie Kollege are all insureds under the insurance policy and that Defendant was obligated to defend and indemnify them in the underlying actions, as well as reformation of the insurance policy, and damages for breach of contract, breach of implied duty of good faith and fair dealing, common law fraud, and fraud under the New Jersey Consumer Fraud Act.  On June 11, 2008, Defendant removed the action to this Court, asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Plaintiffs moved for partial summary judgment with regard to their request for declaratory judgment and their breach of contract claim.  Defendant responded with a cross-motion for summary judgment on all issues, arguing, <u>inter alia</u>, that the underlying suits are not seeking "damages" due to "bodily injury" and so are not covered by the CGL policy, that the absolute pollution exclusion bars coverage, that neither Stephen Baughman nor Kiddie Kollege are insureds under the policy, and that all other claims fail either as a matter of law or due to an absence of facts.  In the motions process, Plaintiffs have voluntarily dismissed (or clarified that they never sought) the following claims: (1) Plaintiffs are no longer seeking coverage for the <u>Foster</u> matter; (2) Plaintiffs are no longer seeking coverage for

Kiddie Kollege; (3) Plaintiffs do not seek coverage for punitive damages or claims related to property damage; and (4) Plaintiffs have withdrawn the claim for reformation.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)).  In deciding whether there is a disputed issue of material fact, the Court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

### B.  Coverage Disputes

The questions presented regarding coverage call upon the Court to interpret the CGL insurance policy under applicable New

Jersey law.[2]  Generally, when interpreting an insurance policy, "the court should give the words of the policy 'their plain, ordinary meaning.'"  Sahli v. Woodbine Bd. of Educ., 938 A.2d 923, 930 (N.J. 2008) (quoting Zacarias v. Allstate Ins. Co., 775 A.2d 1262 (N.J. 2001)).  If the words of the policy are clear, the policy should be interpreted as written.  Id.  If the words of the policy are ambiguous, the policy will be construed in favor of the insured.  Id.  When looking a policy exclusions, however, the Court must be especially careful.

> Because of the complex terminology used in the policy and because the policy is in most cases prepared by the insurance company experts, we recognize that an insurance policy is a contract of adhesion between parties who are not equally situated.  As a result, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness.  Consistent with that principle, courts also endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured.

Nav-Its, Inc. v. Selective Ins. Co., 869 A.2d 929, 933-34 (N.J. 2005) (internal punctuation and citation omitted).

---

[2] In diversity actions such as this, state law governs the interpretation of an insurance contract.  Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 205 (1938).  The parties appear to agree that New Jersey law should be applied and the Court has no basis to disagree.  See NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 319-20 (3d Cir. 1995) ("[U]nder New Jersey choice of law rules, the law of the place of contracting should ordinarily be applied unless some other state has the 'dominant relationship' with the parties and issues.")

1.   <u>Whether the Relief Requested Constitutes "Damages"</u>

As an initial matter, Defendant argues that none of the underlying complaints are seeking "damages," so that none of the suits are covered under the policy.  Instead, according to Defendant, the suits seek only equitable relief in the form of medical monitoring, which is not "damages" under the CGL. Defendant observes that in the <u>Mignano</u> and <u>Kahana</u> class actions, the judge has expressly limited relief to medical monitoring. (Wynne Certification, Exh. A.)  Plaintiffs respond first that all the underlying complaints seek money damages in addition to other forms of relief.  Further Plaintiffs argue that "damages" should not be construed so narrowly as to exclude all equitable relief and that court-imposed medical monitoring, which would require Plaintiffs to pay the costs of such testing, is "damages" under the CGL policy.  The Court finds, consistent with Plaintiffs' arguments and the New Jersey Supreme Court in <u>Morton Int'l, Inc. v. Gen. Accident Ins. Co.</u>, 629 A.2d 831 (N.J. 1993), that all the underlying suits seek "damages" within the meaning of the CGL policy here.

First, all the underlying complaints do indeed seek traditional monetary damages that satisfy even Defendant's narrow definition of "damages."  (<u>Mignano</u> Complaint Prayer for Relief; <u>Conti</u> Complaint ¶¶ 15-35; <u>Kahana</u> Complaint ¶¶ 191-225.)  The relief has not been limited in <u>Conti</u> so there can be no dispute that this suit seeks traditional compensatory monetary damages that are "damages" under the CGL policy.

13

Second, the Court finds that court-ordered medical monitoring with costs to be paid by defendants as permitted under Ayers v. Twp. of Jackson, 525 A.2d 287 (N.J. 1987), is "damages" under the CGL policy.  In so finding, the Court is led by the decision in Morton, where the New Jersey Supreme Court held that the phrase "as damages" in a CGL policy, where damages is left undefined, should be given its "plain, non-technical meaning" and thus encompassed response costs imposed to remediate environmental damage.  629 A.2d at 843-47.  The court rejected the insurer's argument that "damages" is limited to "traditional tort-liability money damages" and does not cover equitable remedies.  Id. at 843-44.  The Morton court relied on myriad authority to support its ultimate conclusion, and was "fully in accord" with the reasoning of Justice O'Hern, dissenting in New Jersey Dep't of Envtl. Prot. v. Signo Trading Int'l, Inc., 612 A.2d 932 (N.J. 1992):

> "'Damages' means money to most people. Money is what DEP wants from [the insured]. One United States District Court in New Jersey has perhaps stated it best: In assessing what an insured would reasonably expect from a CGL policy, it reasoned that '[t]he average person would not engage in a complex comparison of legal and equitable remedies in order to define * * * damages, but would conclude based on the plain meaning of words that the cleanup costs imposed on [the insured] * * * would constitute an obligation to pay damages.'

Morton, 629 A.2d at 846 (quoting Signo, 612 A.2d at 944).

The reasoning in Morton is equally applicable to the relief sought in the underlying suits here.  In Ayers the New Jersey

14

Supreme Court responded to the difficulties of mass-exposure tort cases where plaintiffs are unable to quantify the enhanced risk of future illness, but will require medical monitoring as a result of their exposure to harmful substances.  525 A.2d at 297-313.  The court held "the cost of medical surveillance is a compensable item of damages where the proofs demonstrate" the risk of future illness and the necessity of testing.  Id. at 313.  The court ultimately concluded that rather than a lump-sum payment by defendants, "a court-supervised fund to administer medical-surveillance payments" is a more appropriate form of remedy.  Id. at 314.  Regardless of whether such relief is considered traditional compensatory damages or equitable relief, it still requires the defendant to pay money to cover the costs of medical monitoring.  As the Morton court so aptly observed, most people would consider this court-ordered money to be "damages," so that medical monitoring costs must be paid "as damages" within the meaning of the CGL policy here.  See 629 A.2d at 846.

While New Jersey courts have not directly addressed the question of whether costs for medical monitoring are "damages" in a CGL policy, Plaintiffs point the Court to an opinion from the Northern District of Illinois which the Court finds persuasive and consistent with the holding in Morton.  In Ace American Ins. Co. v. RC2 Corp., Inc., 568 F. Supp. 2d 946 (N.D. Ill. 2008), the court was faced with underlying complaints that sought both traditional compensatory damages and payment for the cost of

15

medical monitoring to address exposure to lead.  The court found as follows:

> When left undefined in a comprehensive general liability policy such as the ACE Policies, Illinois law accords "damages" a broad, nontechnical meaning that is not limited to compensatory damages and can include equitable relief . . .
> The underlying complaints at issue all seek monetary relief. As plaintiff concedes, some seek monetary damages for other property that was contaminated, which clearly is damages because of property damages. Others seek compensation for stress and anxiety. As previously discussed, bodily injury includes being exposed to lead. Compensation for stress and anxiety related to such exposure would clearly be damages because of bodily injury. All of the cases seek compensation to pay for medical monitoring of underlying plaintiffs who have been exposed to lead contamination from the toys. Whether such relief is legal or equitable in nature does not matter. In either case, it requires payment or expenditure of funds to remediate bodily injury in the form of exposure to lead.

Ace American, 568 F. Supp. 2d at 955-56.  Thus, consistent with the New Jersey Supreme Court's reasoning in Morton, the costs of medical monitoring are "damages" in a standard CGL policy.

Of the cases cited by Defendant in support of a contrary conclusion, none will guide the Court.  Defendant points to Cincinnati Ins. Co. v. Milliken & Co., 857 F.2d 979, 981 (4th Cir. 1988) for a narrow technical definition of "damages," but the New Jersey Supreme Court in Morton expressly rejected Milliken, among others.  Morton, 629 A.2d at 844.  The remaining cases cited by Defendant either fail to support Defendant's argument, Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 788 F. Supp. 846, 851-52 (D.N.J. 1992) (cleanup costs under

CERCLA are "damages" under insurance policy), Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co. of N.J., 528 A.2d 76 (N.J. Super. Ct. App. Div. 1987) (same), or are easily distinguishable, XXL of Ohio, Inc. v. City of Broadview Heights, 341 F. Supp. 2d 825, 831 (N.D. Ohio 2004) (declaratory and injunctive relief expressly excluded by terms of insurance policy), Headley v. St. Paul Fire and Marine Ins. Co., 712 F. Supp. 745, 749 (D.S.D. 1989) (injunctive relief not covered where it did not involve payment of "a sum of money").  The Court consequently finds no reason why the holding in Morton regarding payment for the costs of remediation should not by extended to payments for the costs of medical monitoring, and holds that such relief constitutes "damages" under the CGL policy presently at issue.

> 2.  Whether the Harm Constitutes "Bodily Injury"

Defendant similarly argues that the underlying suits do not allege "bodily injury" and so do not require coverage. Plaintiffs respond that, with the exception of one named class plaintiff, the underlying suits do allege physical harm as a result of their exposure to mercury, but further that exposure to mercury constitutes "bodily harm" whether or not physical symptoms have yet manifested.  As will be explained, the Court agrees with Plaintiffs and concludes that all of the underlying complaints have sufficiently alleged "bodily injury" so as to fall within the scope of the CGL policy.

Plaintiffs are correct that, with the exception of the named plaintiff in the Mignano class action, all the other underlying

complaints specifically allege injury due to exposure to mercury. (Conti Complaint ¶¶ 12-14; Kahana Complaint ¶ 136.)  Only the Kahana plaintiffs, however, point to specific physical symptoms arising from their exposure to mercury.  Regardless, all underlying plaintiffs allege that they were exposed to mercury and that this exposure has increased the risk of illness for those plaintiffs.  (Mignano Complaint ¶¶ 3, 119; Conti Complaint ¶¶ 12-14; Kahana Complaint ¶¶ 6, 8-11.)  This constitutes "bodily injury" under the CGL policy.

The New Jersey Supreme Court has found that exposure to harmful substances, even when that exposure is not immediately accompanied by physical symptoms, can be "bodily injury" under a CGL policy.  In Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974 (N.J. 1994), the New Jersey Supreme Court applied the continuous-trigger theory, which finds that the injury occurs at each exposure to asbestos, in order to assess when there was an "occurrence" which triggered insurance coverage for underlying toxic-exposure tort cases.  Essential to this holding was the court's conclusion that exposure to asbestos, even without accompanying symptoms, was "bodily injury" due to the "increased likelihood of causing or contributing to disease."  Owens-Illinois, 650 A.2d at 982-85.  Though an asbestos case, the Owens-Illinois continuous trigger theory has been applied broadly.  Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 843 A.2d 1094 (N.J. 2004) (applying Owen-Illinois to lead exposure case).  The underlying plaintiffs here allege a similar harm, namely that

they have been exposed to mercury and consequently face an increased likelihood of diseases, including cancer.  This harm constitutes bodily injury, even though the symptoms have not yet appeared.  See Ayers, 525 A.2d at 305 (finding that enhanced risk of disease is a tortiously-inflicted injury under the Tort Claims Act).

Other courts have similarly found that exposure to toxic substances that leads to an increased risk of disease, but without present symptoms, is "bodily injury" as defined by similar CGL policies.  Ace American, 568 F. Supp. 2d at 955 ("exposure to potentially harmful contaminants constitutes bodily injury even without manifestations of sickness or disease"); Burt Rigid Box Inc. v. Travelers Property Cas. Corp., 126 F. Supp. 2d 596, 638 (W.D.N.Y. 2001) (allegations that underlying plaintiffs are at a high risk for developing cancer due to their exposure is "bodily injury"); see Techalloy Co., Inc. v. Reliance Ins. Co., 487 A.2d 820, 824-25 (Pa. Super. Ct. 1984) ("at a minimum, personal injury encompasses allegations of exposure to a hazardous substance, increased risk of injury, anxiety, various internal disorders and tissue damage").  Defendant's reliance on HPF, L.L.C. v. General Star Indem. Co., 788 N.E.2d 753, 756-67 (Ill. App. Ct. 2003), for the proposition that exposure to a harmful substance cannot be "bodily injury" is misplaced, because the underlying complaint at issue merely alleged that a herbal supplement was not "proven safe" as promised, in contrast to the present situation, where underlying plaintiffs allege that

mercury is actually harmful and has caused them injury.  For this
reason the HFP, LLC court distinguished Burt Rigid and Techalloy
to find that there was no allegation of "bodily injury."  HFP,
LLC, 788 N.E.2d at 756-57.  Consequently, consistent with the New
Jersey Supreme Court and other jurisdictions, the underlying
complaints allegations that the plaintiffs were exposed to a
toxic substance - mercury - and as a result have an increased
risk of illness are allegations of "bodily injury" under the CGL
policy here.

The underlying plaintiffs have brought suit to procure,
among other things, the costs of medical monitoring "as damages"
for the "bodily injury" they allegedly suffered due to exposure
to dangerous levels of mercury and so the underlying suits fall
within the general coverage of the CGL policy.

    3.   Absolute Pollution Exclusion

Defendant next maintains that all of the underlying suits
fall within the CGL policy's absolute pollution exclusion because
they involved a "pollutant" -- mercury -- and traditional
environmental pollution.  Plaintiffs respond that the pollution
exclusion is inapplicable because the underlying claims regarding
exposure to mercury inside Kiddie Kollege do not arise from
traditional environmental pollution and further that the
pollution exclusion is ambiguous when applied to the Baughman's
alleged negligent failure to investigate the risk of mercury
contamination in Kiddie Kollege.  For the reasons below, the
Court concludes that the underlying claims against Plaintiffs do

not arise from traditional environmental pollution and so cannot fall within the absolute pollution exclusion of the CGL policy.

The absolute pollution exclusion, and its predecessor the standard pollution exclusion, have generated tremendous amounts of litigation regarding the potentially enormous scope of pollution exclusions in CGL policies.  The New Jersey Supreme Court has been particularly concerned with the potential breadth of these provisions, twice declining to apply the literal meaning of the exclusions in Morton, when looking at the standard exclusion, and most recently in Nav-Its, when looking at the absolute exclusion.  In Nav-Its the court interpreted an absolute exclusion provision similar to the one at issue here and concluded that the scope of the absolute pollution exclusion "should be limited to injury or property damage arising from activity commonly thought of as traditional environmental pollution."  869 A.2d at 937.  Consequently, the court found that the exclusion did not encompass an underlying suit by a physician exposed to fumes as a result of painting, coating and floor sealing work in his office.  Id. at 930, 939.

The Nav-Its court does not provide much specific guidance on the meaning of "traditional environmental pollution," beyond the observation that the exclusion was intended to avoid liability for "'environmental catastrophe related to intentional industrial pollution.'"  869 A.2d at 937 (quoting Motorists Mut. Ins. Co. v. RSJ, Inc., 926 S.W.2d 679, 681 (Ky. Ct. App. 1996)); see Merchants Ins. Co. of N.H., Inc. v. Hessler, No. 03-587, 2005 WL

21

2009902, at *3 (D.N.J. Aug. 18, 2005) ("Traditional environmental
pollution was defined [in <u>Morton</u>] as 'environmental catastrophe
related to intentional industrial pollution.'").  Nevertheless,
additional clues can be found in the cases from other
jurisdictions on which the <u>Nav-Its</u> court relied, the facts of the
underlying suit, and the language of the exclusion it was
interpreting.  All lead to the conclusion that traditional
environmental pollution does not include exposure to toxic
materials released indoors and thus does not include mercury
contamination in Kiddie Kollege.

Several of the cases cites by the <u>Nav-Its</u> hold, among other
things, that traditional environmental pollution necessarily only
applies to those harms caused by toxic substances released out
into the environment, in contrast to exposure to toxins released
in a contained space.  The <u>Nav-Its</u> court quoted with approval the
observation of New York's highest court in <u>Bell Painting Corp. v.
TIG Ins. Co.</u>, 795 N.E.2d 15, 18 (N.Y. 2003), that the absolute
exclusion applies to "broadly dispersed environmental pollution."
The <u>Bell Painting</u> court rejected the insurer's argument that a
change in language "indicates an intent to extend the exclusion
to indoor, as well as outdoor, pollution" relying on the use of
the terms "discharge, dispersal, seepage, migration, release or
escape" - language identical to the pollution exclusion this
Court must now interpret.  795 N.E.2d at 20.  Consequently, the
New York Court of Appeals declined to apply the pollution
exclusion to injuries caused by the release of paint fumes

indoors.  Id.

The Nav-Its court was also led by the Illinois Supreme Court's decision in American States Ins. Co. v. Koloms, 687 N.E.2d 72 (Ill. 1997), where the court declined to apply the pollution exclusion to an underlying suit by persons who inhaled carbon monoxide from a defective furnace, stating:

> The pollution exclusion has been, and should continue to be, the appropriate means of avoiding "'the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment.'" (Emphasis in original.) [West American Ins. Co. v. Tufco Flooring East, Inc., 409 S.E.2d 692, 699 (N.C. Ct. App. 1991)], quoting Waste Management of Carolinas, Inc. v. Peerless Insurance Co., 315 N.C. 688, 698, 340 S.E.2d 374, 381 (1986). We think it improper to extend the exclusion beyond that arena.

Koloms, 687 N.E.2d at 81.  Of those other opinions that the New Jersey Supreme Court relied upon, several similarly found support from case law making the distinction between indoor contamination and outdoor environmental exposure.  Kent Farms, Inc. v. Zurich Ins. Co., 998 P.2d 292, 295-96 (Wash. 2000) (citing Continental Cas. Co. v. Rapid-American Corp., 609 N.E.2d 506 (N.Y. 1993)); Byrd ex rel. Byrd v. Blumenreich, 722 A.2d 598, 601 ( N.J. Super. Ct. App. Div. 1999) (citing Lefrak Organization, Inc. v. Chubb Custom Ins. Co., 942 F. Supp. 949, 953 (S.D.N.Y. 1996)).

The conclusion that indoor contamination does not constitute environmental pollution is reflected in the facts of Nav-Its and the case law on which the Nav-Its court relied.  The underlying suit in Nav-Its involved exposure to fumes in an office building,

while the other courts declined to apply the exclusion to exposure to pesticides sprayed inside an apartment building, MacKinnon v. Truck Ins. Exchange, 73 P.3d 1205 (Cal. 2003), carbon monoxide released from a furnace in a two-story building, Koloms, 687 N.E.2d at 81, and paint fumes released in an office building, Belt Painting, 795 N.E.2d at 18-20.  Moreover, the text of the CSP policy considered by the Nav-Its court defined "pollution hazard" as exposure to pollutants "arising out of the discharge, dispersal, seepage, migration, release or escape of such 'pollutants'," 869 A.2d at 932, which is language that courts have interpreted to exclude indoor contamination. Belt Painting, 795 N.E.2d at 20; see Motorists Mut., 926 S.W.2d at 681.  While the mere presence of contaminant outdoors is not necessarily sufficient, see Byrd ex rel. Byrd v. Blumenreich, 722 A.2d 598 (N.J. Super. Ct. App. Div. 1999) (exposure to fuel back-flowing from a delivery hose due to a faulty intake valve is not traditional environmental pollution), exposure to indoor contaminants is not traditional environmental pollution as defined by the New Jersey Supreme Court.

In the present case, the underlying suits all allege harm due to exposure to mercury contamination inside the Kiddie Kollege building.  The Mignano class action is composed of "children who innocently and unknowingly occupied and attended the day care center contaminated with toxic mercury and mercury vapor.  (Mignano Complaint ¶ 188.)  The injured plaintiff in Conti "used the facility [Kiddie Kollege] for a substantial

24

period of time and became exposed to mercury contamination during that time . . ."  (Conti Complaint ¶ 11.)  The Kahana action was "brought on behalf of all those who require medical monitoring as a result of their exposure to mercury from the Kiddie Kollege Daycare & Preschool, a child care facility that had been located in a heavily contaminated facility on the site of a former mercury thermometer manufacturer."  (Kahana Complaint ¶ 1.)  All the complaints followed NJDEP testing revealing indoor mercury at unacceptable levels.  (Kahana Complaint ¶ 156.)  The fact that some toxins might have spread beyond Kiddie Kollege does not change that fact that the underlying suits seek damages for bodily injury to Kiddie Kollege patrons arising from their exposure to mercury inside Kiddie Kollege.

The underlying suits against the Baughmans, which involve exposure to mercury at Kiddie Kollege, do not arise from traditional environmental pollution, but instead relate to a thermometer manufacturer's failure to cleaning the factory building before they left and the Baughman's failure to check the mercury levels within Kiddie Kollege.  See Nav-Its, 869 A.2d at 937-38; Bell Painting Corp., 795 N.E.2d at 18-20.  This mercury contamination did not arise from "contact with discharge, dispersal, seepage, release or escape of 'pollutants'" as the New Jersey Supreme Court and others have interpreted that phrase in the absolute exclusion provision of the CGL policy here. Consequently, Defendant is not excluded from defending Plaintiffs in the underlying suits because those suits do not fall within

the scope of the absolute pollution exclusion provision.

       4.  <u>Stephen Baughman as Insured</u>

Defendant maintains that Stephen Baughman is not covered under the insurance policy because he is not a named insured. Mr. Baughman is, however, undisputedly an employee of Kiddie Kollege, Becky Baughman's business.  Section II(2)(a) of the CGL policy reads:

> SECTION II - WHO IS AN INSURED
> . . .
> 2. Each of the following is also an insured:
>> a.  Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business . . .

(Becky Baughman Certification, Exh. A.)  Defendant has offered no evidence, and the Court can discover none in this record, to show that Mr. Baughman was an "executive officer," meaning "a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document." (<u>Id.</u>)  In fact, Defendant offers no argument for why Mr. Baughman is not ensured as an employee of "Becky Baughman d/b/a Kiddie Kollege" - the named insured.  In the absence of any evidence to the contrary, the Court finds that Mr. Baughman was insured as an

employee under Section II(2)(a) of the CGL policy.

     5.  <u>Conclusion</u>

In sum, the Court finds that Defendant is obligated to defend and indemnify both Becky and Stephen Baughman in the three underlying suits, for those suits seek "damages" for "bodily injury" and are not within the scope of the absolute pollution exclusion.[3]  Therefore, Plaintiffs are entitled to summary judgment on their claims of breach of contract and declaratory judgment.

**C.  Plaintiffs' Additional Causes of Action**

In addition to their claims seeking coverage, Plaintiffs also allege that Defendant's committed fraud and acted in bad faith by declining coverage.  (Compl. ¶¶ 96-133).  Plaintiffs seek additional relief through common law claims of breach of good faith and fair dealing as well as fraud, and treble damages for violations of the New Jersey Consumer Fraud Act ("NJCFA"), based on Defendant's "misrepresentations" regarding the scope of insurance coverage.  Defendant seeks summary judgment on these claims, arguing that in essence Plaintiffs dispute Defendant's reasonable interpretation of the insurance contract, which is not a basis for liability for fraud or bad faith.  For the reasons

---

[3] Defendant argues, correctly, that it has no obligation to cover the intentional tort of battery.  Nevertheless, "if 'multiple alternative causes of action,' are alleged in the complaint, the insurer's duty to defend continues 'until every covered claim is eliminated.'"  <u>Sahli v. Woodbine Bd. of Educ.</u>, 938 A.2d 923, 930 (N.J. 2008) (quoting <u>Voorhees v. Preferred Mut. Ins. Co.</u>, 607 A.2d 1255, 1259 (N.J. 1992).

set forth below, the Court agrees with Defendant and will dismiss Plaintiffs' common law and statutory claims of fraud and bad faith.

### 1.   Breach of Implied Duty of Good Faith and Fair Dealing

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Pickett v. Lloyd's, 621 A.2d 445, 473 (N.J. 1993) (internal citations omitted). Thus a plaintiff alleging bad faith on the part of an insurance company for the denial of coverage cannot succeed "[i]f a claim is fairly debatable." Id. (internal citations omitted). In the present case, the Court finds that there was a reasonable basis for Defendant's decision to decline coverage, given the potential expanse of a literal reading of the absolute pollution exclusion and the technical meaning of "damages." Therefore the Court will grant Defendant summary judgment as to Plaintiffs' claims of bad faith.

### 2.   Common Law Fraud and NJCFA

A claim of common law fraud requires, among other things, a material misrepresentation of presently existing or past fact. Simpson v. Widger, 709 A.2d 1366, 1373 (N.J. Super. Ct. App. Div. 1998) (citing Jewish Ctr. of Sussex County v. Whale, 432 A.2d 521 (N.J. 1981)); Joseph J. Murphy Realty, Inc. v. Shervan, 388 A.2d 990, 993 (N.J. Super. Ct. App. Div. 1978) (citing Anderson v.

28

<u>Modica</u>, 73 A.2d 49 (N.J. 1950)).  Consequently, fraud cannot be
based on a difference of opinion.  <u>Shervan</u>, 388 A.2d at 993.

> The distinction between fact and opinion is broadly
> indicated by the generalization that what was
> susceptible of exact knowledge when the statement
> was made is usually considered to be a matter of
> fact. Representations in regard to matters not
> susceptible of personal knowledge are generally to
> be regarded as mere expressions of opinion, and
> this is held to be so even though they are made
> positively and as though they are based on the
> maker's own knowledge. Usually, also, to say that a
> thing is only matter of opinion imports that it is
> unsusceptible of proof.

<u>Id.</u> (quoting 37 Am.Jur.2d, Fraud and Deceit, s 46 at 74).

Defendant's letters declining coverage do not include
misrepresentations of fact, but rather are expressions of opinion
regarding the proper interpretation of the contract.  As
previously discussed, the scope of coverage under the CGL policy
at issue, given the facts of this case, was fairly debatable.
The mere fact that Defendant's opinions were, in large part (but
not in total), erroneous does not make them misrepresentations of
fact necessary to establish fraud.  Summary judgment in favor of
Defendant on Plaintiffs' common law fraud claim is appropriate.

A similar problem undermines Plaintiffs' NJCFA claims, which
are based on the same alleged "misrepresentations" underlying
Plaintiffs' common law fraud claims.  The New Jersey Supreme
Court has stated: "[N]ot just any erroneous statement will
constitute a misrepresentation prohibited by the [NJCFA].  The
misrepresentation has to be one which is material to the
transaction and which is a statement of fact, found to be false .

. .'" <u>Gennari v. Weichert Co. Realtors</u>, 691 A.2d 350, 366 (N.J. 1997).  Consequently, statements of opinion are not misrepresentation prohibited by the CFA.  <u>Kern v. Huettl</u>, No. L-1545-04, 2009 WL 2461074, at *5 (N.J. Super. Ct. App. Div. Aug. 13, 2009) (citing <u>Gennari</u>, 691 A.2d at 366).  Defendant's statements of opinion regarding the scope of the insurance policy, even if not Defendant's true opinion, are not the basis for a CFA claim.

In arguing to the contrary, Plaintiffs rely on <u>Weiss v. First Unum Life Ins. Co.</u>, 482 F.3d 254, 266 (3d Cir. 2007), where the Third Circuit held that "[t]he CFA covers fraud both in the initial sale (where the seller never intends to pay), and fraud in the subsequent performance (where the seller at some point elects not to fulfill its obligations)."  In <u>Weiss</u>, the plaintiff alleged that the insurance company intentionally failed to investigate his claim and engaged in a broad scheme of defrauding customers.  <u>Id.</u> at 257.  The Court of Appeals explained that Weiss "aver[ed] not merely a bad-faith denial of benefits limited to his case, but rather that his denial [was] one instance in a pattern of fraudulent activity by [the insurance company] aimed at depriving its insureds with large disability payouts of their contractual benefits."  <u>Id.</u>  By contrast, Plaintiffs allege only that Defendant misrepresented the scope of their insurance policy.  The Court finds that this difference of opinion is not a basis for CFA liability.  Having failed to allege or establish any fraud by Defendant, Plaintiffs' claim under the CFA cannot

survive.  See Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 168 (3d Cir. 1998) ("The mere denial of insurance benefits to which the plaintiffs believed they were entitled does not comprise an unconscionable commercial practice [under the NJCFA]."). The Court will grant Defendant summary judgment on Plaintiffs' NJCFA claim.

## III. CONCLUSION

For the foregoing reasons, the Court will enter an order declaring Defendant's obligation to defend and indemnify Plaintiffs Becky and Stephen Baughman in the underlying state court actions, grant summary judgment in favor of Plaintiffs as to liability for breach of the insurance contract. The Court will grant summary judgment to Defendant as to Plaintiffs' claims for breach of implied duty of good faith and fair dealing, common law fraud, and violations of the NJCFA. As Plaintiffs have voluntarily dismissed their claims for reformation, the Court will further grant summary judgment for Defendant on those claims.

The accompanying Order shall be entered.


__November 12, 2009__                        __ s/ Jerome B. Simandle__
Date                                         JEROME B. SIMANDLE
                                             United States District Judge